## HEARN v. CHARLES A. STEVENS & BRO.

(Supreme Court, Appellate Division, First Department. February 9, 1906.)

1. CONTRACTS—CONSTRUCTION—COMPENSATION—AMOUNT.

Where a contract provided that plaintiff should manage a department in defendants' store and be paid a percentage of the profits, and defendants, on opening a new department and transferring to it certain goods formerly sold in plaintiff's department, consulted him about it and paid him a percentage of the profits under a supplemental contract which plaintiff refused to sign, plaintiff was entitled to the same percentage of the profits of the new department that his contract gave him from the profits of his department as originally constituted.

2. SAME—PERFORMANCE—WAIVER OF BREACH.

A contract provided that plaintiff should manage a department in defendants' store and be paid a percentage of the profits. A certain sum was to be paid plaintiff weekly, and at the end of the first year the excess of plaintiff's percentage of the profits over the weekly payments was to be placed to his credit, but forfeited if he should fail to perform his contract. A dispute arose as to the goods on which plaintiff was entitled to a commission, and plaintiff accepted payments made according to defendants' claims. Held, that he was not thereby precluded from suing, after the termination of the contract, for the commissions which he claimed.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 1480–1484.]

Appeal from Trial Term, New York County.

Action by Harry J. Hearn against Charles A. Stevens & Bro. From a judgment dismissing the complaint, plaintiff appeals. Reversed.

Argued before O'BRIEN, P. J., and McLAUGHLIN, INGRAHAM, LAUGHLIN, and CLARKE, JJ.

Morris J. Hirsch (Herbert H. Maass and Chas. Grossman, of counsel), for appellant.

James, Schell & Elkus (Abram I. Elkus and Wm. R. Hayes, of counsel), for respondent.

CLARKE, J. This action was brought to recover $3,077.59 as unpaid commissions alleged to be due under a written contract of employment of the plaintiff by the defendant for the term of three years. The plaintiff entered upon the period of service under the contract and completed the same. By the terms of the contract plaintiff was to act "in the capacity of assistant manager of the departments herein mentioned for a term of three years at a salary which shall equal 4 per cent. of the gross profits on the net retail sales of the cloaks and suits now known as 'Departments Nos. 21 and 18,' and additional bonus hereinafter mentioned, and party of the first part guarantees to the party of the second part that said amount will not be less than four thousand six hundred and forty dollars per year." The plaintiff was "to devote his whole time, best energy, and ability to the promotion of the welfare of the business." He was to be paid $70 or $75 each week, and agreed—

"To accept that as payment in full for his services should he at any· time by any act or failure on his part to perform his duty as set forth in this contract terminate said contract before two years. * * * It is understood and agreed that the difference between $3,640 (being 52 weeks at $70 per week) and the 4 per cent. of the profits on the net retail sales for the year shall at

the end of the first year be placed to the credit of the party of the second part and remain as a penalty for the fulfillment of this contract by the party of the second part for the second year. At the end of the second year the aforesaid commissions are to be paid to the party of the second part, and the commissions for the second year placed to his credit on the same terms and conditions as before. Upon the completion of this contract at the end of the third year the commissions for the second and third years are to be paid in one lump sum together. The party of the first part hereby guarantees that said commission shall not be less than $1,000 each year for the three years. * * * Party of the first part agrees to pay to party of the second part as a further commission, or extra bonus, one-half of 1 per cent. of the net retail sales of the above department in excess of $400,000."

The defendants had a large establishment in the city of Chicago. At the time the contract herein was made, and at the time the period of service provided for began, cloaks and suits were sold at retail in departments 18 and 21 of said establishment. It was of these departments that plaintiff was made manager, and it was upon the net retail sales of the cloaks and suits therein that he was to receive 4 per cent. of the gross profits; and if the net retail sales of the said departments exceeded $400,000 he was to receive an extra bonus of one-half of 1 per cent. The same goods continued to be sold in those departments during 1901, the first year of employment, and part of the year 1902. In the fall of 1902, the misses' cloaks and suits were taken from departments 21 and 18, and, with children's cloaks and suits, were thereafter sold in a new department, known as "24." This new department 24 was considered by the defendant to be within the terms of the contract, and plaintiff was paid for the whole period 4 per cent. of the gross profits of the net retail sales of departments 18, 21, and 24, and, the sales of said departments having exceeded $400,000, one-half of 1 per cent. additional bonus. In June, 1902, the cheaper grades of goods in departments 18 and 21, cloaks and suits, were taken therefrom and, together with furs, waists and millinery, were placed in another new department, known as the "Wabash Annex." The plaintiff had been asked his opinion in regard to this change, and said that he thought it a good one. Thereafter, and before the annex was opened, the president of defendant handed plaintiff a paper reading:

"Commencing with May 1, 1902, the following additional commissions will be added to your salary: From the Wabash Annex $250 for each $1,000 sales made in that department on your lines. Also, 4 per cent. of the gross profits on the net retail sales of silk dress skirts. Also one-half of 1 per cent. of the net retail sales of silk dress skirts on $100,000, or, in other words, one-half of 1 per cent. on the total net retail sales of departments 21 and 18 over $500,000, with the silk skirts included in one of these departments. These extra commissions to become due and payable according to our regular contract and added as an addition to the compensation therein mentioned."

The plaintiff testified that he told Mr. Stevens that he would take this paper home and look it over; that the next morning he returned the paper, telling him that "I would not sign it; that I knew that under the arrangement that we had that he would use me all right, which he said he would; and that I stood ready at any time to do the buying or anything that I was asked to do." The plaintiff further testified that in another conversation with Mr. Stevens, the president of the defendant, Mr. Stevens informed him that he had a buyer for the

annex department, "which I objected to, and I told him that I thought that, when he asked me in the first place about it, it would be under the same management of his brother and myself, and conducted in that way according to my contract; and he informed me that he could hire as many buyers as he wished."

The plaintiff has been paid the 4 per cent. on all cloaks and suits sold in departments 18, 21, and 24, and the one-half of 1 per cent. on such sales over $400,000. He has also received one-half of 1 per cent on the sales of the cloaks and suits in the annex. His claim is that the cloaks and suits so sold in the annex were goods which were in departments 18 and 21 at the time of the making of the contract and of the commencement of his employment thereunder, and hence were included within the terms thereof, and that, instead of one-half of 1 per cent., he should have been paid 4 per cent.; and it is for that amount he sues. The plaintiff was the only witness examined, and when his case was closed the learned court granted the motion to dismiss, saying:

"There is nothing in the contract between the defendants and the plaintiff that prevented the defendants from opening and operating the so-called 'annex department.' There was no right in the plaintiff under the contract in suit to claim any compensation whatever upon any of the business done in the annex. * * * If the employé, the plaintiff in this case, desired to place any limitation or restriction upon the authority of the defendants as to subsequent changes, he should have required by putting language and provision in the contract giving him the exclusive right during the period of his employment to the control of so much of the business of the defendants as was then embraced in those departments."

It will be noted that the contract was for three years, that the amount of the salary depended upon the gross profits made in the departments being a fixed percentage upon such profits, and that such percentage was to be reckoned "on the net retail sales of the cloaks and suits now known as 'Departments Nos. 21 and 18.'" It seems to me clear that the only reasonable interpretation of this contract is that it was intended to and did cover the cloaks and suits then sold in said departments. Those cloaks and suits were known to both parties. That construction makes the contract clear and determinate. Any other construction would leave it uncertain and loose, and might lead to absurd results. This construction was acted upon by the defendant. When it created department 24, out of 18 and 21, by sending into that department some of the articles theretofore dealt in in 18 and 21, it paid without question the agreed percentage upon all sales in that new department. Why should defendant consult plaintiff about the opening of the Wabash Annex, tender him the paper writing in respect thereto, and actually pay to him one-half of 1 per cent. commission on sales therein "on your lines," unless it realized that it was restricted by the contract? It seems obvious that the defendant knew that plaintiff had a good claim and attempted to adjust it by a supplementary agreement.

Counsel for the defendant suggests that plaintiff is precluded by his conduct from making this claim. It does not seem to be that plaintiff could justly be asked to jeopardize his contract by threats, disputes, or litigation during its continuance. It was for three years. It was valuable. The defendant had secured peace for itself by providing

that $70 or $75 a week should be full payment for his services, "should he at any time, by any act or failure on his part to perform his duty as set forth in this contract, terminate said contract before two years." Further, it had provided that all of his remuneration beyond $3,640 a year would be placed to his credit "and remain as a penalty for the fulfillment of this contract" by plaintiff for the next year. What stronger inducement could there be for waiting until the termination of the contract before seeking to enforce his legal rights? Having insured itself against trouble, defendant should not be heard to complain that it was not made. If the defendant's interpretation of the contract is correct, as found by the trial court, that it had the right to open as many departments as it pleased, then not only this one line of goods could have been taken from the plaintiff, but all his lines could have been taken away, and hence there could have been no sales in departments 21 and 18 of cloaks and suits, no gross profits thereon, and so nothing on which to calculate his percentage.

In Horton v. Hall & Clark Mfg. Co., 94 App. Div. 404, 88 N. Y. Supp. 73, plaintiff had a contract to sell the goods of defendant, a manufacturing company, for a year on a commission of 5 per cent. The defendant sold out its business and ceased manufacturing within the year. The defendant claimed that the contract was not sufficiently definite to obligate it to manufacture any particular quantity, or continue manufacturing, or to prevent the transfer of its business, and that, even if it were guilty of a breach of the contract, only nominal damages were recoverable. This court said:

"We think it clear that in making this contract there was an implied agreement on the part of the defendant to continue manufacturing throughout the year, and that in suspending manufacture and transferring its business it was guilty of a breach of the contract."

And it sustained a recovery.

In Wells v. Alexandre, 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218, the defendants agreed to purchase from the plaintiff at a certain specified price all coal necessary for the use of certain steamships running on a steamship line between New York and Cuba, of which they were the owners, during the year 1888. During that year the defendants sold the said steamers and ceased to operate them. The court said:

"The evident intention of the parties was that the plaintiff should furnish to the defendants all the coal which the steamers named should require in the work in which they were employed for the year ensuing, and that the parties should perform all needful acts to give effect to the agreement. Therefore, if a notice was necessary to its proper execution, a covenant to give such notice will be inferred; for any other construction would make the contract unreasonable and place one of the parties entirely at the mercy of the other. The fact that the defendants deemed it best to sell the steamers cannot be permitted to operate to relieve them from the obligation to take the coal which the ordinary and accustomed use of the steamers required."

In Russell v. Allerton, 108 N. Y. 288, 15 N. E. 391, it was held that, when there is uncertainty or doubt as to the meaning of words or phrases used in a contract, in seeking for the intent of the parties as evidenced by the words used, the fact that a construction contended for would make the contract unreasonable and place one of the parties

entirely at the mercy of the other may properly be taken into consideration.

In Wilson v. Mechanical Orguinette Co., 170 N. Y. 541, 63 N. E. 550, the court said:

"While it is true that the vicissitudes of business might have compelled the termination of the contract before its expiration by limitation, it is obvious that no such contingency arose. * * * Both parties assumed the hazard of an enterprise that might prove unprofitable, but neither of them incurred the risk of having the other voluntarily incapacitated from the honest observance of their mutual compact. * * * The contract is of such a nature that the defendant assumed the implied duty of doing nothing that would render it incapable of performing its part thereof. By necessary implication of the language and subject-matter of the contract, the defendant is still bound to do that which it might have done and could have been compelled to do if it had continued its business after 1887 as it did before. * * * In speaking of implied provisions Judge Finch said in Genet v. D. & H. Canal Co., 136 N. Y. 593, 32 N. E. 1078, 19 L. R. A. 127: 'They always exist where equity and justice require the party to do or refrain from doing the thing in question; when the covenant on one side involved some corresponding obligation on the other; when by the relations of the parties and the subject-matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it.'"

It seems to me that these cases establish the rule that the contract must be interpreted in view of the conditions existing at the time the arrangement was entered into, and that, if the continuance of those conditions is necessary to the proper performance of the contract, a provision is to be implied that neither party is voluntarily to change those conditions to the detriment of the other. Applied to the case at bar, the provision to be implied was that the cloaks and suits then sold in the department over which plaintiff was placed should be continued therein, and, if not, that he should still be entitled to his commissions on their sale. It follows that it was error to dismiss the complaint. Of course, this opinion is upon the record as we find it. The defendants have not been heard. They may be able upon their proof to establish a good defense. But, as upon a dismissal the plaintiff is entitled to the most favorable view of the evidence, we hold that he has made out a prima facie case.

Judgment reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.